IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

|  | **OPINION & ORDER** |
|---|---|
| ELIZABETH COMBS; | |
| THOMAS JOHNSTON; | Civ. No. 6:23-cv-01486-AA |
| | |
| KIMBERLY HERECHBERGER; | Civ. No. 6:23-cv-01892-AA |
| | |
| MICHELLE BOLTZ, | Civ. No. 6:24-cv-00246-AA |
| | |
| Plaintiffs, | |
| v. | |
| | |
| PEACEHEALTH, | |
| | |
| Defendant. | |

AIKEN, District Judge.

Before the Court is Defendant PeaceHealth's consolidated Motion for Summary Judgment, ECF No. 47, and Motion to Strike, ECF No. 69. Plaintiffs Elizabeth Combs, Thomas Johnston, Kimberly Herechberger,[1] and Michelle Boltz bring religious discrimination claims against their former employer PeaceHealth under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and ORS 659A.030. *See* Combs and Johnston First Am. Compl. ("FAC") No. 6:23-cv-01486-AA, ECF No. 18; Herechberger Compl., No. 6:23-cv-01892-AA, ECF No. 1; and Boltz FAC,

---

[1] PeaceHealth notes that Kimberly Herschberger's last name is misspelled as Herechberger. PeaceHealth testified Plaintiff's name is spelled Herschberger in PeaceHealth records. Le Decl. ¶ 64, ECF No. 50.

No. 6:24-cv-00246-AA, ECF No. 18.    Michelle Boltz also brings a disability discrimination claim under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA") and ORS 659A.112.  The cases were consolidated for the limited purpose of briefing summary judgment motions as to Defendant's undue hardship defense.  For the reasons explained below, Defendant's Motions, ECF Nos. 47, 69, are GRANTED.  Plaintiffs' claims are DISMISSED.

## BACKGROUND

"PeaceHealth is a not-for-profit healthcare system headquartered in Vancouver, Washington, with medical centers, critical access hospitals, and medical clinics located in Washington, Oregon, and Alaska."  Le Decl. ¶ 3, ECF No. 50.  "As of August 2021, PeaceHealth employed approximately 16,250 caregivers across Alaska, Oregon, and Washington,"  including "approximately 5,720 caregivers in Oregon."  *Id.*

I.    *The COVID-19 Pandemic*

From May 5, 2020, until May 11, 2023, COVID-19, an infection caused by the virus SARS-CoV-2, caused a global pandemic.  Koekkoek Decl. ¶ 4, ECF No. 48.  Dr. Douglas Koekkoek, MD, PeaceHealth's Chief Physician and Clinical Executive during the pandemic, testified that COVID-19 "is spread primarily through respiratory particles that travel through the air, which can land in a human's eyes, nose, throat, or mouth" to cause infection and is "one of the most contagious currently known human pathogens."  *Id.* ¶¶ 4, 2.  During the summer of 2021, the COVID-19 Delta variant, "the deadliest and most transmissible variant of COVID-19 to date," spread through Oregon and the rest of the country, *id.* ¶ 10, causing an approximate 300%

Page 2 – OPINION AND ORDER

spike in national COVID-19 cases, *id.* ¶ 37, Ex. 12, ECF No. 48-12, and, in Oregon, causing a spike that exceeded OHSU worst case scenario prediction models, *id.* 19, Ex. 4, 5, 6, ECF Nos. 48-4, 48-5, 48-6.

Dr. Koekkoek testified that "[i]n [his] 35-plus years in healthcare, [he] ha[s] never experienced anything like the Delta variant." *Id.* ¶ 11. Dr. Koekkoek testified that "PeaceHealth's facilities were overflowing with patients[,]" that their ICUs were so full that they "had to stop elective surgeries and convert [former ICU] recovery areas into COVID ICU areas[,]" *id.*, "which created treatment delays for patients with other serious conditions[,]" *id.* ¶ 12. Dr. Koekkoek testified that because the local morgues could not handle more dead bodies, PeaceHealth had to turn some of their areas into "cooling bays" to hold bodies of individuals who had died from COVID-19[,] *id.* ¶ 11, that "family members and coworkers [became] ill with COVID[,]" *id.*, that "the Oregon Governor activated the Oregon National Guard to assist PeaceHealth with everything from janitorial work to administering COVID-19 tests[,]" *id.* ¶ 22, and that "[t]he impact was devastating and profound—despite all precautionary efforts in effect[,]" *id.* ¶ 11. Dr. Koekkoek testified that his experiences with H1N1, influenza, Ebola, and the wildfires "pale in comparison to the impact of the Delta variant." *Id.*

II.    *Oregon Health Authority Response*

On August 5, 2021, the Oregon Health Authority ("OHA") issued a rule requiring all Oregon healthcare providers and staff to either be fully vaccinated against COVID-19 by September 30, 2021, absent medical or religious exception, or

to "undergo COVID-19 testing at least weekly." *Former* OAR 333-019-1010(3)-(5) (eff. Aug. 5, 2021, to Aug. 24, 2021) ("OHA Rule" or the "Rule").

But less than three weeks later, on August 25, 2021, OHA amended the Rule to remove the testing option and to require vaccination of all health care providers and staff by October 18, 2021, absent medical or religious exception. *Former* OAR 333-019-1010(3)-(4), (eff. Aug. 25, 2021, to June 30, 2023). The rule also provided that employers "take reasonable steps to ensure that unvaccinated healthcare providers and healthcare staff [with vaccine exceptions] are protected from contracting and spreading COVID-19." *Former* OAR 333-019-1010(5). Notably, at the time that OHA amended the Rule, health care facilities, including PeaceHealth, were already complying with masking and physical distancing requirements and with requirements to screen, triage, and isolate symptomatic individuals and those known to be infected with the virus. *See former* OAR 333-019-1011 (eff. Aug. 20, 2021, to Mar 28, 2023); *former* OAR 437-001-0744 (eff. Nov. 6, 2020, to Apr. 2, 2023).

III.    *PeaceHealth's COVID-19 Vaccination Policy*

Earlier that summer, in response to CDC and OHSU Delta variant forecasts and other epidemiologic data, PeaceHealth convened an Ethical Discernment Team (the "Team") to determine whether PeaceHealth should require its caregivers to be vaccinated against COVID-19. *Id.* ¶¶ 24, 25 (citing Ex. 7, Ethical Discernment five-step decision-making process, ECF No. 48-7). Starting in late July 2021 and continuing into the fall and throughout the Pandemic, the team reviewed PeaceHealth's internal epidemiologic data, *id.* ¶ 21, as well as CDC Morbidity &

Mortality Weekly Reports ("MMWR") and other scientific and medical data published in leading peer-reviewed medical journals about the COVID-19 Delta variant, the safety and efficacy of the COVID-19 vaccine and other mitigation methods, *id.* ¶¶ 26, 31–41 (citing Ex. 9–17, ECF Nos. 48-9 through 48-17), OHSU's Oregon Delta variant forecasts, *id.* ¶ 19 (citing Ex. 4, 5, 6, ECF Nos. 48-4, 48-5, 48-6), recommendations from OHA, CDC, and professional health care organizations such as the American Nursing Association, American Hospital Association, and American Medical Association, *id.* ¶¶ 18, 28, 35–41 (citing Ex. 3, 11, 12, 13, 17, ECF Nos. 48-3, 48-11, 48-12, 48-13, 48-17), and actions taken by other major hospital systems such as the Veterans Administration, *id.* ¶ 28. Dr. Koekkoek testified that "[b]y late July 2021, it was clear that the threat and ultimate arrival of the Delta variant posed a foundational risk to PeaceHealth's ability to deliver healthcare services." *Id.* ¶ 23.

Dr. Koekkoek testified that "[b]y August 2021, COVID-19 had become a pandemic of the unvaccinated." *Id.* ¶ 20. "PeaceHealth census data showed that approximately 80% of COVID-19 patients hospitalized in its Oregon facilities were unvaccinated, 90% of COVID-19 patients in Oregon ICUs were unvaccinated, and over 90% of COVID-19 patients in the ICU on a ventilator in Oregon were unvaccinated." *Id.* He testified that "[a] significant portion of PeaceHealth's patients are medically vulnerable individuals, who either could not be vaccinated (due to age or medical conditions) or who, despite vaccination, are more susceptible to serious illness or death if they are exposed and experience a breakthrough contraction of COVID-19." *Id.* ¶¶ 7, 26–27, 32, 36 (describing medically vulnerable patients). Dr.

Page 5 – OPINION AND ORDER

Koekkoek testified that the Team reviewed a July 2021 CDC report, in which the CDC recommended that healthcare employers "[c]onsider vaccine mandates for [healthcare providers] to protect vulnerable populations," in addition to "[u]niversal masking for source control and prevention[.]" *Id.* ¶ 36 (citing Ex. 11, CDC, *Improving communications around vaccine breakthrough and vaccine effectiveness*, (July 29, 2021)). Carina Le, PeaceHealth System Director People Operations, testified that, on August 3, 2021, PeaceHealth records showed that, in Oregon, 1,130 of 5,720 (19.7%) of PeaceHealth caregivers were unvaccinated or undeclared (failed to respond to vaccination status surveys). Le Decl. ¶ 13.

Dr. Koekkoek testified that by early August, scientific data and guidance from the CDC, OHA, and other leading public health sources indicated that COVID-19 vaccines were safe and effective, protected against severe illness and death, reduced the risk of viral transmission, and that vaccinated individuals were less likely to suffer severe illness or death—information reviewed by the Team. Koekkoek Decl. ¶ 32 and ¶¶ 31, 33–37 (citing Ex. 9–17).[2] PeaceHealth's internal epidemiologic data

---

[2] An August 2, 2021 editorial published in the New England Journal of Medicine ("NEJM") review of vaccine efficacy studies "showed that through the end of June 2021, COVID-19 vaccines had averted an estimated 279,000 deaths and 1.25 million hospitalizations in the United States." Koekkoek Decl. ¶ 33, Ex. 9 (Stephen J.W. Evans & Nicholas P. Jewell, *Vaccine Effectiveness Studies in the Field*, 385(7) N. ENG. J. MED. 650 (Aug. 2, 2021)); a June 30, 2021 study published in the NEJM "showed that being fully vaccinated against COVID-19 reduced the risk of infection by 91% and still protected against severe illness and hospitalization if breakthrough infection occurred." Koekkoek ¶ 34, Ex. 10 (Mark G. Thompson, et al., *Prevention and Attenuation of Covid-19 with the BNT162b2 and mRNA-1273 Vaccines*, 385(4) N. ENG. J. MED. 320–329 (June 30, 2021)); a July 29, 2021 CDC Report "indicated that unvaccinated individuals were 8 times more likely to contract COVID-19 than vaccinated individuals; 25 times more likely to be hospitalized if they contracted

also showed that COVID-19 vaccination reduced viral transmission. That data showed that PeaceHealth's patients were 7.1 times more likely to have been exposed to COVID-19 and 11.6 times more likely to get COVID-19 from an unvaccinated caregiver as compared to a vaccinated caregiver. *Id.* ¶ 21; *see also* Kroll Decl. ¶¶ 17–19, ECF No. 49 (citing Ex. 2, 3, 4, ECF No. 49-1, 49-2, 49-3). Dr. Koekkoek testified that "PeaceHealth's Infection Prevention team had traced the death of two patients at one of its facilities outside Oregon to COVID-19 exposure from an unvaccinated caregiver." *Id.* ¶ 44. Epidemiologist Catherine Kroll, PeaceHealth's System Director of Infection Prevention, testified that the disparity between the unvaccinated and vaccinated caregiver exposure and transmission rates "were alarming [because] [h]ospital-acquired COVID-19 could prolong a patient's stay in one of our facilities by days or weeks, further straining limited hospital resources." Kroll Decl. ¶ 20.

Dr. Koekkoek testified that on July 27, 2021, the Ethical Discernment team unanimously decided to implement a vaccination requirement policy. *Id.* ¶¶ 26, 27.

---

COVID-19; and 25 times more likely to die as a result of COVID-19." Koekkoek ¶ 36, Ex. 11 (CDC, *Improving communications around vaccine breakthrough and vaccine effectiveness*, (July 29, 2021)); a September 2021 CDC Morbidity & Mortality Weekly Report ("MMWR") "pooled clinical and observational trial data for the Pfizer BioNTech vaccine showed that it was approximately 95% effective at preventing hospitalization or death." Koekkoek Decl. ¶ 40, Ex. 15 (Kathleen Dooling, et al., *Use of Pfizer-BioNTech COVID-19 Vaccine in Persons Aged >16 Years: Recommendations of the Advisory Committee on Immunization Practice–United States, September 2021*, 70 MMWR 2021:1344–1348 (Sept. 24, 2001), https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e2.htm (last visited Mar. 13, 2026).

On August 3, 2021, PeaceHealth announced an employee vaccination requirement that complied with the original OHA Rule. *Id.* ¶ 29.

On August 30, 2021, PeaceHealth formally updated its COVID-19 Vaccination Requirement Policy in response to updated guidance from the CDC and OHA, and in response to OHA's amended Rule, which removed the testing option from the vaccination requirement for healthcare employees. Le Decl. ¶ 17.

Dr. Koekkoek testified that, on August 16, 2021, the Team decided to implement a medical and religious exception policy and "considered potential options . . . for those caregivers who could not work fully remotely." Koekkoek Decl. ¶¶ 42, 43, Ex. 18, ECF No. 48-18. Dr. Koekkoek testified that the Team determined, based on its "review of the internal and external data and guidance [and] . . . the medical science[,] . . . that, while multiple methods of protection against COVID-19 were important, vaccination was the single most important method." *Id.* ¶ 43. Dr. Koekkoek testified that the Team determined that, "unlike vaccination, other methods—such as PPE (including N95 masks), testing, social distancing, restrictions on visitation, and additional hand hygiene protocols—were already the 'baseline' requirements, do not provide continuous protection 24 hours per day, and are susceptible to human error[,]"and that, to be effective, PPE must be worn properly and must be worn continuously but was less likely to be worn, for example, in breakrooms where transmission could occur. *Id.* ¶ 44. As to testing, Dr. Koekkoek testified that by time a test is positive, an infected person is likely to be contagious for 48 hours before the test and that the cost of repeatedly testing a large volume of

Page 8 – OPINION AND ORDER

unvaccinated caregivers was "significant." *Id.* ¶ 45. Dr. Koekkoek testified that the Team determined that, unlike the other preventive measures, "vaccination not only protects against acquiring and transmitting the virus, it also—unlike any other preventative measures—reduces the likelihood that an infected individual is contagious or will develop serious illness or death if they do contract the virus." *Id.* ¶ 46.

Dr. Koekkoek testified that the Team determined that given the risk of viral transmission to PeaceHealth's vulnerable patient population and to other staff, that allowing unvaccinated caregivers to work in person was an "unjustifiable" risk "regardless of whether the caregiver was in a patient facing or direct patient care role, or if they worked with [other] caregivers who were in patient facing or direct patient care roles." *Id.* ¶¶ 43, 44. He testified that "[t]he caregivers themselves were also at risk[,]" that "[m]ore caregivers and patients becoming infected with COVID-19 threatened PeaceHealth's ability to continue providing essential, life-saving treatment for its patients." *Id.* ¶ 49.

Dr. Koekkoek testified, that based on that data and reasoning, the Team determined on or about August 18, 2021, that "allowing unvaccinated caregivers to work in person (even with other precautions) would have subjected other caregivers and patients—including those who were medically fragile or vulnerable—to a higher risk of contracting COVID-19[,]" *id.* ¶ 48, and that "[t]he caregivers themselves were also at risk" from unvaccinated employees, *id.* ¶ 49.

IV.    *Plaintiffs*

In August 2021, Plaintiffs were employed at PeaceHealth's Sacred Heart Medical Center at Riverbend in Springfield, Oregon. Def. Mot. at 15–17. Combs was employed as a Cook. Combs. Decl. ¶¶ 2–4, ECF No. 58; Le Decl. ¶ 40. Johnston was employed as a "Registered Cardiovascular Invasive Specialist." Johnston Decl. ¶¶ 1–3, ECF No. 59; Le Decl. ¶ 48. Herechberger was employed as a per diem Inpatient Registered Nurse ("RN") in the Neonatal Intensive Care Unit. Am. Herechberger Decl. ¶¶ 1, 7, ECF No. 63; Le Decl. ¶¶ 64, 65. Boltz was employed as an Inpatient RN in the Short Stay Unit. Boltz Decl. ¶ 2, ECF No. 60; Le Decl. ¶ 56.

Plaintiffs each applied for and were granted a religious exception to PeaceHealth's vaccination requirement. Le Decl. ¶¶ 41, 49, 57, 66. They later either obtained other employment or were terminated. Combs Decl. ¶ 2; Johnston Decl. ¶ 15; Am. Herechberger Decl. ¶ 12; Boltz Decl. ¶ 12. Boltz also applied for a medical exception, which was denied. Le Decl. ¶ 58. Plaintiffs bring Title VII, ADA, and state law claims for failure to accommodate their religious beliefs and medical disability.

**LEGAL STANDARD**

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential

Page 10 – OPINION AND ORDER

element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325).

A court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). But "[c]redibility determinations [and] the weighing of the evidence" are jury functions, not those of a judge, ruling on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## DISCUSSION

Plaintiffs bring religious discrimination claims under Title VII and Oregon law against their former employer, PeaceHealth, for failure to accommodate their religious beliefs in opposition to COVID-19 vaccination. In addition to bringing a religious discrimination claim, Boltz brings a disability discrimination claim against

PeaceHealth for failure to accommodate her disability under the ADA and Oregon law.

I.    *Evidentiary Objection*

As a preliminary matter, Defendant moves to strike the testimony of Plaintiffs' expert witness, Rose Walker-Patterson, because she is "unqualified to render the opinions in her Reports" and because her opinions are unreliable and irrelevant. Def. Reply at 3–4, ECF No. 69.  Patterson offers an amended and a rebuttal report (collectively, "Reports") on several matters connected to this case.  *See* Janzen Decl., Ex. J (Patterson Am. Rep.), ECF No. 62-10; Ex. K (Patterson Rebuttal Rep.), ECF No. 62-11.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 permits a qualified expert to present testimony that "will help the trier of fact to understand the evidence or to determine a fact in issue," so long as (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–95 (1993). The proponent of expert evidence must prove its admissibility by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592 n.10.  A party who seeks to introduce expert testimony must show that their expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion.  Fed. R. Evid. 702.

Trial judges are charged with ensuring that "any and all . . . [expert] evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). "A district court cannot be silent about reliability when challenged." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022).

A.    *Patterson is Qualified to Offer Infection Preventionist Testimony*

PeaceHealth contends that Patterson is not qualified to offer expert testimony because she lacks relevant education, training, and experience. Def. Reply at 7.

In her amended Report, Patterson opines that "PeaceHealth could have implemented [r]easonable accommodation of the weekly testing program without significant hardship or expense and could have simply worked with the Oregon Health Authority to implement similar best practices in disease transmission prevention to provide accommodations for religious and disabled workers who needed them." Am. Patterson Rep. at 12. She further opines that even "direct patient caregivers . . . can easily be accommodated with infection control methods [such as masking and weekly testing]." *Id.* at 12–13. Patterson states that her opinions are based on her experience as a nurse infection preventionist. *Id.* at 2–6. In her amended Report, Patterson also interprets various scientific and medical studies and epidemiologic data. *Id.* at 7, 10, 13–29. And she opines as to COVID-19 vaccine safety

Page 13 – OPINION AND ORDER

and efficacy, *id.* at 7, 10, 13, 15–29, vaccine injuries and vaccine-related deaths, *id.* at 7, 10, 13, 15–29, FDA vaccine approval, *id.* at 7, 9, 10, risks to patients and other staff from vaccinated employees, *id.* at 7, 10, 15–29, and natural immunity as a viable COVID-19 mitigation strategy, *id.* at 20, 25.

Patterson is a Registered Nurse, with a master's degree in nursing administration—not epidemiology, virology, or infectious disease—who earned a certificate in infection control and prevention from the Certification Board of Infection Control and Epidemiology. *See* Janzen Decl., Ex. P at 1 (Patterson Resume), ECF No. 62-16; Patterson Dep. 75:21–80:14. From April 2017 through October 2022, Patterson worked as the Infection Preventionist and Employee Health nurse for Sky Lakes Medical Center ("SLMC"), a small, rural hospital in Klamath Falls, Oregon. Patterson Resume; Patterson Dep. 86:02–86:09; Patterson Am. Report ¶ 9. Patterson was part of a committee that developed a "playbook planning for the pandemic[,]" with which she was "heavily involved." *Id.* at 86:10–87:05. She reported to the Director of Quality but quit her job in October 2022 after the Director unexpectedly resigned, and she was not selected for that position. Patterson Resume; Patterson Dep. 87:14–88:23.

Patterson is not a medical doctor and has no advanced education or training in epidemiology or in infectious diseases or any other medical field. *See* Patterson Dep. 74:02–75:01, ECF No. 70-1 (confirming that she is not a "subject matter expert in epidemiology or infectious diseases" and explaining: "Infectious diseases is a medical term and I would say that I'm an infection preventionist, which is the nursing term,

so infectious disease is medicine, infection prevention and control is nursing."); *see also* Lauren Decl., Ex. 4, Rebuttal Expert Report of Dr. Seth Cohen, M.D. (hereinafter "Cohen Report") ¶ 6, ECF No. 70-4 (opining that a nurse working in infection control lacks expertise "on vaccination, infectious disease, public health or epidemiology" and noting that "[Patterson's] position during the pandemic was administrative without a significant patient care component"); Patterson Dep. 79:23–80:08 ("I've never provided a medical diagnosis in anything."). Patterson also does not have any advanced training in a field such as public health, epidemiology, or biostatistics that would confer expertise to conduct clinical investigations or analyses, undertake literature reviews, or interpret clinical studies. Patterson Dep. 76:03–77:06 (confirming that she has no training or professional experience evaluating vaccine clinical trial and surveillance data or designing or conducting vaccine safety or efficacy studies). Further, she has no research experience or publications related to COVID-19. *Id.* at 85:12–85:15. And she has never taught at a college or university. *Id.* at 85:21–85:24. Patterson testified that she would defer to scientific and medical experts when it comes to vaccine efficacy and safety. *Id.* at 76:25–77:09. Patterson testified that she has not ever served as an expert witness, is "very novice[]," "ha[sn't] done this before[,]" *id.* at 31:14–32:09, found the process to be "overwhelming[,]" remarked on the "tremendous amount of information to pull together[,]" *id.* at 39:11–40:13, and stated, "this is an unbelievable amount of information and I honestly had no idea that it was going to be this much reading[,]" *id.* at 44:23–45:12.

The purpose of a court's gatekeeping role "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Here, the Court concludes that Patterson does not have sufficient knowledge, education, or training to offer a scientific or medical opinion about proper hospital COVID-19 pandemic policy.

Plaintiffs contend that if Patterson does not qualify as a scientific or medical expert, she does qualify to offer expert opinion based on her knowledge and experience as an infection control nurse at SLMC during the pandemic. Pl. Sur Reply at 6, ECF No. 74. Patterson testifies that in her role as nurse infection preventionist, she helped develop the weekly testing program at SLMC for employees with approved accommodations. Patterson Dep. 140:08–140:23. Plaintiffs concede that Patterson's opinions on "the effectiveness of the vaccine, the possibility of other treatments for Covid-19, and the extent of protections conferred by natural immunity are tangential to her core opinions that are directly tied to her qualifications." Pl. Sur Reply at 6. Accordingly, the Court strikes Patterson's testimony as to vaccine safety and efficacy, alternative COVID-19 treatments, and COVID-19 protection acquired from natural immunity.

Federal Rule of Evidence 702 provides:

> If scientific, *technical, or other specialized knowledge* will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by *knowledge, skill, experience*, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. Rule Evid. 702 (emphasis added).

Page 16 – OPINION AND ORDER

"This language makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge." *Kumho*, 526 U.S. at 147. "It makes clear that any such knowledge might become the subject of expert testimony." *Id.* Accordingly, the Court concludes that although Patterson is not qualified to offer scientific or medical opinion, she is qualified to offer expert testimony based on her knowledge and experience as a nurse infection preventionist at SLMC during the pandemic.

B.    *Patterson's Infection Preventionist Testimony is Neither Reliable nor Relevant*

A court's "gatekeeping" duty under Rule 702 and *Daubert* "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho*, 526 U.S. at 141. "*Daubert* pointed out that Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of [that witness's] discipline.'" *Id.*

Even non-scientific testimony based on knowledge and experience must be both reliable and relevant under Rule 702. *Id.* Patterson's testimony fails to meet either of these requirements.

1.    *Patterson's Opinions are not Reliable*

To be reliable, expert testimony must be "based on sufficient facts or data," must be "the product of reliable principles and methods," and must reflect "a reliable application of those principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Reliable expert testimony must be based on sufficient facts or data—on

Page 17 – OPINION AND ORDER

external objective sources, not on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. And an expert must show the court that they have used reliable methodology based on facts and data to reach their conclusions. *In re Phenylpropanolamine (PPA) Products Liability Litigation*, 289 F. Supp. 2d 1230, 1238 (W.D. Wash. 2003) ("In the absence of independent research or peer review, experts must explain the process by which they reached their conclusions and identify some type of objective source demonstrating their adherence to [sound methodology]."). "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of [the] methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (quoting *Daubert*, 509 U.S. at 595). However, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (finding nothing in either *Daubert* or the Federal Rules of Evidence requiring the admission of opinion evidence connected to existing data "only by the [say so] of the expert").

Patterson's opinions are not reliable because they are not based on sufficient facts or data, nor are they the product of reliable principles and methods.

First, Patterson's opinions are not based on sufficient facts or data because (1) she based her opinions on an incorrect understanding of the OHA Rule, and (2) she provides no documentation or data to support the work she claims to have done at SLMC. Patterson testified that her SLMC team "follow[ed] OHA guideline[s] to the letter[,]" Patterson Dep. 124:20–125:16, and that she believed SLMC's weekly testing program was "valid and credible" because it was recommended by OHA and that

Page 18 – OPINION AND ORDER

OHA's "source was the [CDC]," *id.* at 136:21–137:04; *see also id.* at 137:07–137:23 (opining that hospitals licensed by the OHA should follow the OHA's recommendations "to the letter"). In her expert report, Patterson stated that "[d]ue to the limited COVID vaccine efficacy and substantial health risks, SLMC also chose to follow the OHA recommendations for weekly testing in lieu of vaccination for those employees with medical and religious exceptions." Am. Patterson Rep. at 10. But Patterson was not aware that OHA had amended its initial August 5, 2021 rule to remove the testing option a short three weeks after it had been issued. Patterson Dep. 148:10–149:12 ("I haven't seen this version [of the OHA rule] before."). Patterson testified that she helped implement a testing program for unvaccinated SLMC employees with approved exceptions and that her team at SLMC followed the OHA rule "to the letter," yet she did not know that OHA had removed the testing option from its rule.

Patterson also provides no documentation for the program she claims to have developed or implemented, and she provides no data about the clinical variables or outcomes of that program. *See* Patterson Dep. 113:14–114:01 (stating that SLMC tracked COVID-19 hospitalizations, on-site acquired cases and deaths and that she thought SLMC "compared very well" to other Oregon hospitals but that she does not have that data); *id.* at 115:03–25 (stating that she did not know whether any severely ill patients were transferred out of SLMC because she has no data and is recalling from memory and explaining that the data "all belongs to the hospital[,]" so she cannot access it); *id.* at 129:15–130:05 (admitting that when she stated in her report

that SLMC hospital-acquired COVID-19 cases were "infrequent," she based that statement on her memory because she lacks access to the data); *id.* at 130:06–129:10 (admitting that without the SLMC data, she cannot compare SLMC hospital-acquired infection rates to those of PeaceHealth); *id.* at 131:01–131:04 (stating that even though she lacks access to the data "if there was something very significant and glaring, I would have remembered"); *id.* at 131:07–131:12 (stating that she does not have SLMC data comparing the number of hospital-acquired cases from vaccinated versus unvaccinated caregivers); *id.* at 132:04–133:02 (stating that she lacks access to SLMC's contact tracing policy or any underlying contact tracing data); *id.* at 141:05–142:08 (confirming that she helped develop the SLMC weekly testing program but does not have any documents or underlying data about that program). Given the facts of this case, recalling facts, data, and policy from memory without underlying documentation or data is insufficient to support expert testimony.

The Court concludes that Patterson's testimony is not based on sufficient facts and data because Patterson's opinions rely on her misunderstanding of the OHA Rule and because Patterson fails to provide any underlying documentation or data to support her testimony.

Second, Patterson's opinions are not reliable because, in addition to failing to provide documentation and data, she also did not use reliable principles and methods to produce her opinions. In fact, Patterson did not produce her opinions at all. She did not conduct her own research, produce her own exhibits, or author significant parts of her Reports. A court must consider "whether the expert [is] proposing to

Page 20 – OPINION AND ORDER

testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*).

Further, Federal Rule of Civil Procedure 26 requires that an expert witness prepare and *sign* a written expert report. Fed. R. Civ. P. 26(2)(B) (emphasis added). Rule 26 does not contemplate that an expert would offer a report not of her own making. In fact, "it would be fundamentally misleading[] and could do great damage to the integrity of the truth finding process, if testimony that was being presented as the independent thinking of an 'expert' in fact was the product, in whole or significant part, of the suggestions of counsel." *Intermedics, Inc. v. Ventritex, Inc.*, 139 F.R.D. 384, 395–96 (N.D. Cal. 1991). "[E]xpert reports may be discredited if they 'merely express the opinions of the lawyers who hired them.'" *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1118 (D. Or. 2010) (quoting *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 294 (E.D. Va. 2001)).

When asked whether Plaintiffs' attorney "provided [Patterson] with any facts or substantive input" for her Reports, Patterson testified:

> I asked [Plaintiffs' attorney] to coach me in order to prepare this document, so I would have to go look at those individual paragraphs in order to tell you specifically if—exactly what may or may not have been exactly my words, but I asked—I asked for coaching in order to prepare this document because I've never done this before . . .

Patterson Dep. 170:12–18.

Page 21 – OPINION AND ORDER

Plaintiffs' counsel not only "coached" Patterson but also provided her with the studies and exhibits she used in her Reports. Patterson Dep. 106:13–108:16; *see also id.* at 27:18–28:20 (testifying that Plaintiffs' counsel provided her with a copy of the French Report to use as a model); *id.* at 95:24–96:12 (testifying that she used the "beautifully written" French Report as an example to draft her Reports); *id.* at 149:13–150:19 (testifying that Plaintiffs' counsel drafted the part of her expert report comparing PeaceHealth and SLMC and contradicting a statement in her report that she reviewed Plaintiffs' job descriptions); *id.* at 171:02–171:24 (explaining that she started writing the rebuttal report the morning of her deposition and that she wrote the rebuttal report in response to the "[w]rong physician[,]" not in response to Defendant's expert, Dr. Koekkoek); *id.* at 150:06–150:19; 167:20–170:18 (explaining that Plaintiffs' counsel wrote entire paragraphs of her Reports).

Plaintiffs' counsel not only provided Patterson with the French Report to use as a "model"—a report rejected by numerous courts in this district,[3] including this

---

[3] The French Report, written by Dr. Richard Scott French, has been offered as expert opinion in many prior similar cases litigated by Plaintiffs' counsel. The French Report has been rejected as junk science by numerous courts in this district. *See, e.g.*, *Sano v. PeaceHealth, Inc.*, No. 6:22-cv-01210-MTK, 2024 WL 4979429, at *2–5 (D. Or. Dec. 4, 2024) ("The [c]ourt has reviewed the French Report and finds that every portion of it falls below the admissibility standard."); *Goff v. PeaceHealth*, No. 6:22-cv-01991-MTK, 2024 WL 4979432, at *2–*5 (D. Or. Dec. 4, 2024) (same); *Parsons v. PeaceHealth*, No. 6:22-cv-01246-MTK, 2024 WL 4979430, at *2–5 (D. Or. Dec. 4, 2024) (same); *Parker v. PeaceHealth*, No. 6:23-cv-00450-MTK, 2024 WL 4993472, at *2–5 (D. Or. Dec. 5, 2024) (same); *Cline v. PeaceHealth*, No. 6:23-cv-01985-MTK, 2025 WL 295113, at *2–5 (D. Or. Jan. 24, 2025) (same); *Gemmrig v. Asante Three Rivers Med. Ctr.*, LLC (*Gemmrig I*), No. 1:22-cv-01814-AA, 2025 WL 1787524, at *3–6 (D. Or. June 25, 2025), *adopted sub nom. Gilinsky v. Asante*, No. 1:23-cv-00799-CL, 2025 WL 2170528 (D. Or. July 31, 2025) (same).

Court—but counsel also provided scientific and medical studies to Patterson that counsel re-named according to the conclusions that counsel urged Patterson to reach. *Id.* at 107:16–108:16; *see also, e.g.*, Janzen Decl., Ex. P, No. 10 ("Exhibit 10 Cleveland Clinic Article Showing Vaccines Dont [sic] work"), ECF No. 62-16. Patterson also testified that she did not fully read all of the literature cited or relied on in her Reports because serving as an expert witness in these cases "is over and above my full-time [job]" and "this is an unbelievable amount of information and I honestly had no idea that it was going to be this much reading." *Id.* at 44:23–45:12.

When asked whether she had viewed the PeaceHealth data on hospital-acquired infection, Patterson stated "I read some of [Dr. Koekkoek and Ms. Kroll's] . . . information. . . . What was I supposed to do with it?" *Id.* at 116:08–116:25. Finally, Patterson was not able to provide basic information about PeaceHealth—its facilities, its infection control methods, its finances, or the types of jobs Plaintiffs performed. *Id.* at 150:20–153:15.

"To carry out its gatekeeping role, a district court must find that an expert's testimony is reliable—an inquiry that focuses not on 'what the experts say,' or their qualifications, 'but what basis they have for saying it.'" *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (quoting *Daubert II*, 43 F.3d at 1316). The Court concludes that Patterson did not conduct her own research, she did not undertake an independent analysis of the facts and data, and she did not author significant parts of her own Reports. Patterson's opinions not only lack factual basis; they also are not the product of reliable principles and methods.

Page 23 – OPINION AND ORDER

### 2.     *Patterson's Opinions are not Relevant*

Rule 702 provides that expert testimony is admissible if it will "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule 702 also requires that "the expert's opinion reflect[] a reliable application of the principles and methods to the facts of the case." *Id.* That is, an expert's testimony must be relevant.

Even if Patterson's testimony were reliable, it is not relevant. Patterson lacked the relevant facts and data to compare SLMC to PeaceHealth. Patterson testified generally about the differences between the two healthcare employers. *See, e.g.,* Patterson Dep. 116:08–116:25 ("being a smaller, single hospital versus a system, we weren't comparable [to PeaceHealth] in all ways, in all situations"); *id.* at 114:04–114:17 (explaining that SLMC "actually compared maybe slightly better [than other Oregon hospitals] in some cases, because we had the advantages of being . . . a smaller facility with less patient volumes . . . and a smaller community"). She also testified that she lacked the relevant facts and data to compare PeaceHealth to SLMC. *Id.* at 129:06–130:10. Importantly, the undue hardship standard at issue requires that an employer tasked with an accommodation decision consider the facts before them at the time they made the decision. *See Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1152 (D. Or. 2024) ("It is appropriate to confine the analysis to the information available to the employer when it made its undue hardship decision."). That healthcare facilities faced with different facts may have made different undue hardship decisions is irrelevant.

In sum, Patterson's testimony is neither reliable nor relevant. Patterson's testimony is not "based on sufficient facts or data," is not "the product of reliable principles and methods," and fails to reflect "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. For that reason, Patterson's testimony is not admissible under Rule 702 and is struck in its entirety.

II.     *Religious Discrimination Employment Claims*

All four Plaintiffs bring claims against PeaceHealth under Title VII and ORS 659A.030 for failing to accommodate their religious views by not allowing them to work as unvaccinated healthcare employees. All Plaintiffs applied for and were granted a religious exception to the PeaceHealth's COVID-19 vaccination requirement. All Plaintiffs were placed on unpaid administrative leave and later either found a different job or were terminated.

PeaceHealth moves for summary judgment on the undue hardship defense to Plaintiffs' Title VII religious discrimination claims.

Under Title VII, it is unlawful for an employer . . . "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion[.]" 42 U.S.C. § 2000e-2(a)(1). ORS 659A.030 provides a state analogue. "Because [ORS] 659A.030 is modeled after Title VII, [a] plaintiff's state law discrimination claim can be analyzed together with her federal discrimination claim." *Pullom v. U.S. Bakery*, 477 F. Supp. 2d 1093, 1100 (D. Or. 2007).

Page 25 – OPINION AND ORDER

"A claim for religious discrimination under Title VII can be asserted under several different theories, including disparate treatment and failure to accommodate." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). To establish a *prima facie* claim of religious discrimination under a failure-to-accommodate theory, a plaintiff must show that: (1) they "had a bona fide religious belief, the practice of which conflicts with an employment duty"; (2) they "informed [their] employer of the belief and conflict"; and (3) "the employer discharged, threatened, or otherwise subjected [them] to an adverse employment action because of [their] inability to fulfill the job requirement." *Id.* at 606. Once a plaintiff has made a *prima facie* case, the burden shifts to the defendant to show that it "initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1224 (9th Cir. 2023) (internal citation and quotation marks omitted). If the employer establishes undue hardship, the analysis is done and summary judgment should be granted. *See Peterson,* 358 F.3d at 608.

Defendant contends that even assuming that Plaintiffs establish a *prima facie* case of religious employment discrimination, there is no genuine dispute of material fact that Plaintiffs could not perform their jobs 100% remotely and that it would have been an undue hardship to allow them to work in person during the relevant timeframe. Def. Mot. at 21, 23.

Page 26 – OPINION AND ORDER

Plaintiffs contend that there are issues of material fact as to whether other "less-restrictive" accommodations were available. Pl. Resp. at 4, ECF No. 57.

A.    *Plaintiffs Could not Perform their Jobs Remotely*

There is no dispute that Plaintiffs could not have performed 100% of their jobs remotely.

1.    *Elizabeth Combs*

Combs was employed as a cook in the PeaceHealth kitchen from 2012 until 2021.  Combs Decl. ¶ 2.  Combs requested and was granted a religious exception to Defendant's vaccination requirement.  *Id.*  Combs was placed on administrative leave and was later terminated in April 2023.  *Id.* ¶ 12.

Combs testified that she "worked in the back of the kitchen by the coolers to manage the packaged cold items that were sent to other PeaceHealth facilities, [their] cafeteria, and for the tray line[,]" that "[her] station was in the back of the kitchen[,]" and that normally she worked alone but occasionally had help from others.  *Id.* ¶¶ 3, 4; Le Decl. ¶ 40 (classifying job as "direct contact with other caregivers and indirect contact with patients" and providing description of job's essential functions).  Combs testified that, on August 31, 2021, she "participated in a schedule[d], recorded phone conversation with PeaceHealth's HR representative, [her] manager . . . and [her] union representative[.]"  *Id.* ¶ 5.  She was told that there was no remote work for her because "[she] couldn't cook from home."  *Id.* ¶ 6.  Combs testified that "none of the remote positions pertained to [her] career as a cook[,]" and that "[she] did not meet the minimum requirements to apply for those positions."  *Id.* ¶ 7.

Page 27 – OPINION AND ORDER

### 2.    *Thomas Johnston*

Johnston was hired as a "Registered Cardiovascular Invasive Specialist" at PeaceHealth on January 18, 2021. Johnston Decl. ¶¶ 1–2. Johnston requested and was granted a religious exception to Defendant's vaccination requirement. *Id.* ¶ 5. Johnston was placed on administrative leave and, in April 2023, decided "to part ways with PeaceHealth." *Id.* ¶ 15.

Johnston testified that he performed three roles: (1) a "scrub assistant" who "scrubbed in with the physician and assisted with sterile equipment[;]" (2) a "circulating technologist" who "would obtain and open sterile supplies needed for the procedure[;]" and (3) a "monitoring technologist" who "would be stationed at a computer to document what equipment was used and where in the patient's body." *Id.* ¶ 3; Le Decl. ¶ 45 (classifying job as "direct patient care" and providing description of job's essential functions).

Johnston testified that after PeaceHealth updated its vaccination policy (to remove the testing option), he was told that he would be placed on unpaid administrative leave "since [he] worked directly with patients and could not perform [his] job completely remote[.]" *Id.* ¶ 7. He hoped instead to work in the cardiac catheterization lab because he had catheterization lab billing experience and testified that "[he] could have helped with Cath Lab chart review [or] worked remotely on post-image processing[.]" *Id.* ¶ 9. He testified that Peace Health "did not have any dialogue with [him] about any of these possible accommodations." *Id.* ¶ 10.

### 3.    *Kimberly Herechberger*

Page 28 – OPINION AND ORDER

During the relevant timeframe, Herechberger was a per diem Neonatal ICU nurse. Am. Herechberger Decl. ¶¶ 1, 7. Herechberger requested and was granted a religious exception to COVID-19 vaccination. *Id.* ¶ 1. Herechberger was placed on unpaid administrative leave and later terminated. *Id.* ¶¶ 1, 12–14.

Herechberger testified that, as a Neonatal ICU nurse, she "provid[ed] bedside care for neo-natal patients." *Id.* ¶¶ 1, 7; Le Decl. ¶¶ 64, 65 (classifying job as "direct patient care" and providing description of job's essential functions). Herechberger testified that "[she] could have safely performed [her] job wearing an N95 mask and doing weekly testing for COVID-19." *Id.* ¶ 7. She also testified that "[she] could have transitioned to fully remote clerical work[,]" *id.* ¶ 8, but that PeaceHealth "did not engage in any real negotiation or discussion with [her] regarding a reasonable accommodation[,]" *id.* ¶ 9, and that "[she] was not offered any type of accommodation other than unpaid administrative leave[,]" *id.* ¶¶ 10–11.

### 4.  *Michelle Boltz*

Boltz testified that she was hired by PeaceHealth as an RN in the Short Stay Unit in 2013. Boltz Decl. ¶ 2. Blotz requested and was granted a religious exception. Boltz Decl. ¶ 12. Boltz was placed on administrative leave and later found other work. *Id.* ¶¶ 10, 12.

Boltz testified that, as an RN in the Short Stay Unit, "[she] would receive the patient and then stay in the room with the patient to prepare the patient for surgery[,]" "ask the patient questions[,]" "start IVs and do other hands-on work with the patient." *Id.* ¶ 2; Le Decl. ¶ 56 (classifying job as "direct patient care" and

Page 29 – OPINION AND ORDER

providing description of job's essential functions).  She testified that she could have worked remotely doing "preadmission testing," ("PAT"), a position that involved calling patients before surgery and asking questions "to determine how many surgeries the person has had and what medications they take."  *Id.* ¶ 4.  She testified that she could have been placed in PAT because, when she was pregnant, she had been placed in PAT as an accommodation.  *Id.* ¶ 5.  She testified that she also could have "work[ed] remotely . . . to make follow-up phone calls to check on patients post-surgery."  *Id.* ¶ 7.  But she was told that there was no remote work for her.  *Id.* ¶ 8.  She testified that she changed jobs in March 2022, when "[she] was hired by [her] current hospital employer as a nurse in a short stay unit[,]" and "[her] religious exemption was accepted[.]"  *Id.* ¶ 12.

In sum, due to the nature of Plaintiffs' jobs, the parties do not dispute that Plaintiffs could not perform their job 100% remotely.

B.    *Undue Hardship Standard*

To defeat an employee's Title VII failure-to-accommodate religious discrimination claim, an employer must show "that it could not reasonably accommodate the employee without undue hardship."  *Bolden-Hardge*, 63 F.4th at 1224.

Plaintiffs contend that "[u]nder *Groff v. DeJoy*, 600 U.S. 447 (2023), Title VII required PeaceHealth to consider reasonable alternatives for exempt employees and then prove that accommodating each Plaintiff would impose substantial increased costs to its particular business."  Pl. Resp. at 3.  Plaintiffs contend that PeaceHealth

Page 30 – OPINION AND ORDER

could have instituted accommodations for in-person work such as masking, testing, distancing, "cohorting with low-risk teams or non-patient areas;" "temporary duty modification or task reallocation;" "reassignment to vacant lower-risk positions;" or "changes within the facility network" without incurring such costs. *Id.* at 8.

To prevail on an undue hardship defense under *Groff v. DeJoy*, 600 U.S. 447, 470–71 (2023), "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." To assess "substantial increased costs," *Groff* directs courts to "take[] into account all relevant factors . . . including the particular accommodations at issue and their practical impact in light of the nature, size[,] and operating cost of [an] employer[]" and to "resolve *whether a hardship would be substantial* in the context of an employer's business in [a] common-sense manner." *Id.* at 471 (emphasis added). *Groff* thus directs courts to examine all "relevant factors" and "their practical impact," not just economic costs.

In the COVID-19 vaccination context, the Ninth Circuit recently held that relevant undue hardship factors under *Groff* include: (1) "health and safety costs[,]" which the court analyzed as health and safety *risks* to the plaintiffs' coworkers and to the public they served; (2) the employer's "operational burden;" (3) and the employer's "financial costs." *Petersen v. Snohomish Reg'l Fire & Rescue*, 150 F.4th 1211, 1220 (9th Cir. 2025) (affirming summary judgment for the employer on its undue hardship defense to unvaccinated firefighters' Title VII failure-to-accommodate claims).

Page 31 – OPINION AND ORDER

The EEOC also provides guidance as to relevant factors in the COVID-19 context. "Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business—including, . . . the risk of the spread of COVID-19 to other employees or to the public[.]" *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, § L.3 ("EEOC Guidance").[4]   To determine whether a COVID-19 accommodation would create an undue hardship, the EEOC recommends that employers consider:

- the proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with nonemployees[;]
- the burden on the conduct of the employer's business—including . . . the risk of the spread of COVID-19 to other employees or to the public;
- whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works . . . in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals); and
- the number of employees who are seeking a similar accommodation, i.e., the cumulative cost or burden on the employer.

*Id.*

*Groff* did not displace pre-existing EEOC guidance.  Rather, *Groff* stated that "a good deal of the EEOC's guidance [as to undue hardship] is sensible and will . . . be unaffected by our clarifying decision[.]"  *Groff*, 600 U.S. at 471; *see also Petersen*, 150 F.4th at 1220 ("*Groff* tells us that we may look to EEOC guidance to help determine if  . . . health and safety costs would have imposed an undue hardship on

---

[4]  EEOC, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS, § L.3 (updated May 15, 2023) https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last visited Mar. 13, 2026).

[an employer].”); *Lavelle-Hayden*, 744 F. Supp. 3d. at 1151 (“Consistent with the pre- and post-*Groff* authority, . . . it is appropriate to consider not only calculable economic costs but also non-economic costs, like the cost to an employer's mission and potential safety risks, in analyzing undue hardship.”).

Accordingly, to determine whether an accommodation would impose an undue hardship on an employer, courts in this district consider: (1) the information available at the time the employer made its undue hardship decision; (2) the economic and non-economic costs of the accommodation; and (3) the cumulative or aggregate effects of accommodations requested by multiple, similarly situated employees. *Lavelle-Hayden*, 744 F. Supp. 3d. at 1151–52.

    1.    *The Information Available at the Time*

To determine undue hardship, “it is appropriate to confine the analysis to the information available to the employer when it made its undue hardship decision.” *Lavelle-Hayden*, 744 F. Supp. 3d at 1152. “To judge an employer's undue hardship decision based on knowledge and information developed after the fact would hold that employer to an impossible standard.” *Id.*

Dr. Koekkoek's unrebutted testimony shows that the information available to the Ethical Discernment Team when it formulated its vaccination policy included: (1) the OHA Rule, Def. Mot. at 27; Dr. Koekkoek Decl. ¶¶ 30, 51; (2) then-current scientific and medical data including recommendations from CDC, OHA, OHSU, and peer-reviewed studies from established medical authorities, as to the nature of the pandemic and the safety and efficacy of the vaccine and other mitigation methods, *id.*

Page 33 – OPINION AND ORDER

at 27–28; Dr. Koekkoek Decl. ¶¶ 18, 19, 26, 28, 31–41; (3) PeaceHealth's internal epidemiologic data that showed that hospital patients were more likely to be infected with COVID-19 by unvaccinated caregivers than by vaccinated caregivers, *id.* at 28; Dr. Koekkoek Decl. ¶ 21; Kroll Decl. ¶¶ 17–19, and that the COVID-19 deaths of two PeaceHealth patients had been traced to an unvaccinated caregiver, Dr. Koekkoek Decl. ¶ 44; (4) that PeaceHealth's patient population consisted largely of medically vulnerable and unvaccinated patients, *id.* at 29; Dr. Koekkoek Decl. ¶¶ 7, 36, 43, 48; Kroll Decl. ¶¶ 20, 21; and (5) the nature of PeaceHealth's work environment, its "religious-based mission," and its "legal and moral duty" to protect patients and staff from the threat of "severe illness or death[,]" *id.* at 29; Dr. Koekkoek Decl. ¶¶ 6, 42–44.

The unrebutted scientific and medical evidence, reviewed and considered by the Ethical Discernment Team, showed that COVID-19 vaccines were safe and effective, reduced transmission, and "offered high levels of protection against severe illness and death from COVID-19," Koekkoek Decl. ¶¶ 32–34, 36, 38, 39, 40, that vaccination was superior to natural immunity in preventing re-infection, *id.* ¶ 41, that "other methods—such as PPE (including N95 masks), testing, social distancing, restrictions on visitation, and additional hand hygiene protocols—were already the 'baseline' requirements, do not provide continuous protection 24 hours per day, and are susceptible to human error[,]" *id.* ¶ 44, that PPE must be worn "constantly and appropriately" and is often not, for example, in breakrooms when people are eating and drinking, *id.*, that testing is problematic because "by the time an individual tests

Page 34 – OPINION AND ORDER

positive, they have often been contagious for 48 hours prior to the test[,]" *id.* ¶ 45, and that physical distancing is "not practicable, if not impossible," in a health care setting, *id.*

### 2. *The Costs of Accommodation*

To determine the costs of accommodation, *Groff* directed courts to "take[] into account all relevant factors . . . including the particular accommodations at issue and their practical impact in light of the nature, size[,] and operating cost of [an] employer[]" and to "resolve whether a hardship would be substantial in the context of an employer's business in [a] common-sense manner[.]" *Groff*, 600 U.S. at 471.

Relevant factors may include health and safety risks to the public and to other employees in the workforce; an operational burden created by absenteeism, scheduling disruption, and the inability to respond to emergencies; and financial costs. *See Petersen*, 150 F.4th at 1220 ("[O]utbreaks among firefighting teams [from unvaccinated co-workers] would lead to potentially severe limits on EMS and firefighting responses in the community."); *see also Groff*, 600 U.S. at 475 (Sotomayor, J., concurring) ("Because the 'conduct of [a] business' plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees. . . . Indeed, for many businesses, labor is more important to the conduct of the business than any other factor."); *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1134, 1136 (C.D. Cal. 2023), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025) ("Numerous courts have found the possibility of an unvaccinated individual

Page 35 – OPINION AND ORDER

getting others sick to be a non-speculative risk that a court may consider when performing an undue hardship analysis.") (collecting cases); *Melino v. Bos. Med. Ctr.*, 127 F.4th 391, 397 (1st Cir. 2025) ("permitting [a registered nurse] to work unvaccinated would pose an undue hardship 'by increasing the risk of COVID-19 transmission amongst staff and patients'"); *Hall v. Sheppard Pratt Health Sys., Inc.*, 155 F.4th 747, 754–55 (4th Cir. 2025) (holding that "[a]llowing over two hundred religious-exemption claimants to remain unvaccinated would have unacceptably increased the risk of COVID-19 transmissions and outbreaks" and constituted undue hardship, but also noting that "[i]t is likely that granting even [a] single religious exemption would have constituted an undue hardship for the hospital system.").

Plaintiffs contend that PeaceHealth could have instituted their proposed accommodations without undue hardship. But Plaintiffs' proposed accommodations are in-person work accommodations, and Plaintiffs do not rebut the evidence that their proposed accommodations, individually or in combination, were markedly inferior to vaccination in reducing COVID-19 transmission and, in the case of breakthrough infection, in reducing morbidity, mortality, and re-infection. This alone—the increased health and safety risks to patients and staff would have constituted a substantial cost and undue hardship. *See* Koekkoek Decl. ¶ 50 ("We believed that the potential costs to human life exceeded any increased financial costs that PeaceHealth incurred as a result of this [exception] policy.") Plaintiffs also do not rebut the evidence that the increased transmission of COVID-19 to staff would have created substantial operational burdens such as increased absenteeism,

Page 36 – OPINION AND ORDER

scheduling disruptions, and impaired ability to deliver healthcare. And Plaintiffs do not rebut the evidence that the increased transmission of COVID-19 to patients would have created substantial operational burdens such as prolonged hospital stays and reduced capacity to deliver healthcare delivery. Finally, Plaintiffs do not rebut the evidence that monitoring and enforcing compliance with such accommodations also would have created a substantial operational burden and substantially increased financial costs.

Plaintiffs maintain that, because, on April 12, 2023, PeaceHealth permitted unvaccinated employees to return to work with N95 and KN95 masking, a reasonable jury could infer that there were other reasonable accommodations for unvaccinated employees in 2021. Pl. Resp. at 14–15. Plaintiffs maintain that PeaceHealth's failure to reinstate Plaintiffs in April 2023 when it allowed unvaccinated employees to return with a masking requirement Dr. Koekkoek testified that in April 2023, after "a careful review of scientific evidence and regulatory requirements," PeaceHealth's medical and clinical leadership determined "that the exposure risk had sufficiently lessened such that it would no longer cause undue hardship to allow unvaccinated workers . . . to return to work in person, provided they complied with additional protective measures, including wearing an N95/KN95 mask at all times while in any PeaceHealth facility." Koekkoek Decl. ¶ 54. On May 11, 2023, OHA likewise suspended the OHA Rule effective May 11, 2023, based on then-current medical and scientific data. *See former* OAR 333-019-1010(4) (temporary suspension effective May 11, 2023, to Nov. 6, 2023). Plaintiffs do not prevail in their argument because

Page 37 – OPINION AND ORDER

PeaceHealth's April 2023 return-to-work decision was based on the facts that existed in 2023, which were different from the facts that existed when PeaceHealth formulated its vaccine mandate policy.

Plaintiffs also maintain that PeaceHealth's failure to reinstate Plaintiffs in April 2023 indicates that "the asserted hardships were, in fact, pretextual[]" and supports their Title VII claims for disparate treatment and retaliation. Pl. Resp. at 17, 15 (and setting out the elements of Title VII disparate treatment and retaliation claims). First, PeaceHealth provided an extensive record as to how it decided to implement a vaccination requirement, which Plaintiffs fail to rebut and which defeats Plaintiffs' assertion of pretext. Second, Title VII disparate treatment and retaliation claims are distinct from Title VII failure-to-accommodate claims. PeaceHealth's consolidated Motion for Summary Judgment, at issue here, was expressly limited to PeaceHealth's defense of Plaintiffs' failure to accommodate claim and is unrelated to any other claims Plaintiffs may or may not have.

### 3.    *The Aggregate Effects*

When multiple, similarly situated employees request accommodation, it is appropriate for a court to "consider the aggregate or cumulative effects of an accommodation[.]" *Lavelle-Hayden*, 744 F. Supp. 3d at 1152; *see also Petersen*, 150 F.4th at 1220 ("The cost of accommodating nearly twenty-five percent of its firefighters is substantial. . . . And given the circumstances, there can be no doubt that granting that many exemptions would have hamstrung [the Fire and Rescue's] operations."); *Kather v. Asante Health Sys.*, No. 1:22-CV-01842-MC, 2025 WL

Page 38 – OPINION AND ORDER

1788267, at *7 (D. Or. June 25, 2025) ("In addition to the administrative strain, the sheer number of exception requests compounded the undue hardship inherent in allowing unvaccinated individuals to work in person because the cumulative risk [to the health and safety of patients and the workforce] would have been much greater than the individual impact of any single unvaccinated employee.").

By August 31, 2021, PeaceHealth had received exception requests from 267 healthcare employees in Oregon, and over 800 healthcare employees system wide. Le Decl. ¶ 20. By August 31, 2021, PeaceHealth approved 213 religious exception requests in Oregon alone. *Id.* While PeaceHealth was able to accommodate some of those caregivers with remote work, *id.* ¶¶ 23–24, it was not able to accommodate Plaintiffs. Further, the "unprecedented flood of exception requests . . . placed an incredible strain on an already exhausted staff to cover shifts and hire and train contract healthcare workers." *Id.* ¶ 22. The aggregate health and safety, operational, and financial costs of accommodating hundreds of unvaccinated employees would have multiplied, if not exponentially increased, the risk and cost burden during the relevant timeframe.

Plaintiffs do not address the aggregate impact of accommodating hundreds of unvaccinated employees on the worksite. Instead, Plaintiffs argue that PeaceHealth failed to "engage[] in an individualized, good-faith interactive process before imposing unpaid leave on each plaintiff." Pl. Resp. at 4. Specifically, Plaintiffs contend that PeaceHealth should have considered in each case "[w]hether less-restrictive accommodations (assignment or location changes, cohorting, schedule segregation,

Page 39 – OPINION AND ORDER

enhanced PPE, and/or testing) were available without causing undue hardship to PeaceHealth." *Id.*

First, Plaintiffs do not rebut the testimony that PeaceHealth conducted a fact-intensive inquiry to formulate an exception and accommodation policy. That policy was a response to the large number of unvaccinated employees with exceptions and the need for a reasonable and consistent approach that applied to all unvaccinated employees. Plaintiffs do not say why PeaceHealth's policy did not apply to them or why it failed to address their individualized situations or why PeaceHealth should have treated them differently from other similarly situated unvaccinated employees.

Second, because PeaceHealth had already determined that in-person contact with unvaccinated caregivers posed an "unjustifiable" health and safety risk to patients and co-workers, the only question to be determined as to each employee was "whether the [employee] could perform the essential functions of their position 100% remotely." Le Decl. ¶ 23. Employees that could perform the essential functions of their position 100% remotely were permitted to work remotely and otherwise were placed on unpaid leave. Plaintiffs do not dispute that they could not perform their jobs 100% remotely. If an employer can show that no accommodation was possible without undue hardship, that employer "[i]s not required to discuss an infeasible alternative accommodation." *Bordeaux*, 2025 WL 655065, at *1 n.3 (citing *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988)).

Plaintiffs contend that PeaceHealth could have reassigned them to remote positions. Johnston testified that he could have done cath lab billing or helped with

Page 40 – OPINION AND ORDER

chart review or worked remotely on post-image processing. Johnston Decl. ¶ 9. Herechberger testified that "[she] could have transitioned to fully remote clerical work." Herechberger Decl. ¶ 8. And Boltz testified that she could have worked remotely by calling surgical patients before admission "to determine how many surgeries the person has had and what medications they take[,]" Boltz Decl. ¶ 4, or could have "work[ed] remotely . . . to make follow-up phone calls to check on patients post-surgery[,]" *id.* ¶ 7. Plaintiffs do not say whether they applied for any remote position or whether those positions were available. To create new remote positions for Plaintiffs and other unvaccinated employees, PeaceHealth would have had to manufacture hundreds of redundant or unneeded positions that would have added a substantial operational and cost burden to a hospital system that was already severely stressed. "[A]n employer is not required to restructure an employee's duties or pass them off to another worker if doing so would be an undue hardship." *Kather*, 2025 WL 1788267, at *8; *see also Lake v. HealthAlliance Hosp. Broadway Campus*, 738 F. Supp. 3d 208, 220–21 (N.D.N.Y. 2024) (holding that operational impacts from restructuring unvaccinated healthcare worker's position to avoid contact with others would have created an undue hardship).

In sum, Plaintiffs fail to rebut the evidence that shows that allowing them to work in person, regardless of accommodation, would have increased the risk of COVID-19 transmission to patients and staff, created substantial operational burdens, and substantially increased financial costs to PeaceHealth's business.

Page 41 – OPINION AND ORDER

Accordingly, PeaceHealth is entitled to summary judgment on its undue hardship defense to Plaintiffs' Title VII and Oregon religious discrimination claims.

III.    *Disability Discrimination Employment Claim*

Plaintiff Boltz also brings a claim against PeaceHealth under the ADA and ORS 659A.112 for failing to accommodate her medical disability.  *See* Compl. ¶¶ 32–42, No. 6:24-cv-00246-AA, ECF No. 1.  She applied for a medical exception to PeaceHealth's vaccination requirement but was denied.  Le Decl. ¶ 58, Ex. 16-C, ECF No. 50-30.  PeaceHealth moves for summary judgment on the undue hardship and direct threat defenses to Plaintiff's ADA claim.

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112.  "The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business."  *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (citing 42 U.S.C. § 12112(b)(5)(A)).

Like Title VII, the ADA and Oregon analogue provide a two-step analysis for failure to accommodate claims.  *See Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 798–99 (9th Cir. 2017) (setting out the elements of a *prima facie* ADA claim).  Once a plaintiff has made a *prima facie* case, the burden shifts to the defendant who may

Page 42 – OPINION AND ORDER

invoke one of two affirmative defenses: (1) that the accommodation "would impose an undue hardship on the operation of the business;" or (2) that the plaintiff would "pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. §§ 12112(b)(5)(A), 12113(b); *see also* 29 CFR § 1630.15. PeaceHealth contends that even assuming that Boltz establishes a *prima facie* case of disability discrimination, there is no genuine dispute of material fact that Boltz could not have performed her job 100% remotely and that it would have been an undue hardship to allow her to work in person during the relevant timeframe. Def. Mot. at 21, 23.

A.    *Undue Hardship*

The ADA undue hardship standard requires a showing of "significant difficulty or expense." 42 U.S.C. § 12111 (10). To determine "significant difficulty or expense," courts rely on EEOC Enforcement Guidance.[5] EEOC Enforcement Guidance directs courts to determine "significant difficulty or expense," by considering the nature and cost of the accommodation, the employer's financial resources, the number of persons employed, the impact on expenses and resources, and the impact of the accommodation on the employer's type of operation including the structure and functions of the workforce. EEOC Enforcement Guidance; ORS 659A.121(2)(a–d).

Though Title VII and ADA undue hardship standards are not identical, they contemplate similar factors. While Title VII contemplates "substantial cost" in the

---

[5] EEOC ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION & UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT NO. 915.002 (Oct. 17, 2002), (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#undue (last visited Mar. 13, 2026); ORS 659A.121(2)(a–d).

Page 43 – OPINION AND ORDER

context of the employer's business, the ADA contemplates "significant difficulty or expense" in light of the "type of operations[,]" and "composition, structure and functions of the [employer's] workforce[.]"  Like Title VII, the ADA defense contemplates both economic cost ("expense") and non-economic cost ("difficulty").  And both determinations are made in the context of an employer's business.

Here, the undue hardship analyses under Title VII and the ADA produce the same outcome.  The health and safety risks to patients and staff from accommodating Plaintiff and other hundreds of other employees with vaccination exceptions in a health care facility during the pandemic would have constituted significant difficulty.  The operational burdens (from increased absenteeism, disrupted scheduling, impaired ability to deliver healthcare services) would have constituted significant difficulty.  And the increased financial costs from the increased health and safety risks and from the increased operational burden would have constituted significant expense.

Plaintiff contends that PeaceHealth does not meet its burden to prove undue hardship on Plaintiff's ADA claim because PeaceHealth failed to engage in an interactive process to identify an effective accommodation. Pl. Resp. at 11.  "[A]n employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process[]" but this is so only "*if a reasonable accommodation would have been possible.*"  *Snapp*, F.3d at 1097 (emphasis in original) (internal citation and quotation marks omitted).  "In other words, there exists no stand-alone claim for failing to engage in the interactive

Page 44 – OPINION AND ORDER

process." *Id.* "Rather, discrimination results from denying an available and reasonable accommodation." *Id.*

Here, PeaceHealth determined that there was no available and reasonable workplace accommodation for unvaccinated employees, even after considering a range of alternatives. The ADA requirement to engage in an interactive process stems from the "inherent informational imbalance between employers and employees" and the fact that employers may have "superior knowledge regarding possible alternative positions." *Id.* "[T]he employee typically will have proposed some accommodation, but . . . '[t]he range of possible reasonable accommodations, for purposes of establishing liability for failure to accommodate, can extend beyond those proposed.'" *Id.* Plaintiff provides no evidence that PeaceHealth failed to consider or withheld information about possible *reasonable* accommodations for in-person caregivers or that there was an available accommodation that would have protected patients and staff as effectively as COVID-19 vaccination. An employer is not required to fundamentally alter the nature of a job or create a new position to accommodate an employee with a disability. *See White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir. 1995); *see also* 42 U.S.C. § 12111(8) ("'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds[.]"); 42 U.S.C. § 12111(9)(B) ("'reasonable accommodation' may include . . . reassignment to a *vacant* position") (emphasis added). Plaintiff, an RN who helped prepare patients for surgery, does not dispute that she delivered direct patient care and could not

Page 45 – OPINION AND ORDER

perform her job 100% remotely. Boltz Decl. ¶ 2. And she does not say whether she applied for any remote job or whether any of those jobs were available.

In sum, the Court concludes that there are no issues of material fact that unvaccinated caregivers, regardless of accommodation, would have imposed both a significant difficulty and a significant expense on PeaceHealth's business. Accordingly, PeaceHealth is entitled to summary judgment on its undue hardship defense to Plaintiff's ADA and Oregon disability discrimination claim.

### B.     *Direct Threat*

A direct threat under the ADA is "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1028 (9th Cir. 2003) (citing 29 CFR § 1630.2(r)). A direct threat determination "shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.* In weighing the risks and their magnitude, "the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority." *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998). Here, that also includes OHA. In reviewing those authorities, courts consider: (1) the "duration of the risk;" (2) the "nature and severity of the potential harm;" (3) the "likelihood that the potential harm will occur;" and (4) the "imminence of the potential harm." *Echazabal*, 336 F.3d at 1028. "The determination that an individual poses a 'direct threat' shall

be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Id.*

Plaintiff does not rebut then current scientific and medical evidence, including evidence from the CDC, NIH, OHA, and other authorities that, during the relevant timeframe, (1) the duration of risk was unknown; (2) the nature and severity of potential harm was grave given the large number of deaths that the COVID-19 Delta variant were causing; (3) the likelihood that the harm would occur was high given the increased risk of transmission from an unvaccinated caregiver especially to a medically vulnerable patient; and (4) the potential harm was imminent, as evinced by the "cooling bays" that PeaceHealth had to create to hold dead bodies.

PeaceHealth determined, based on the "most current medical knowledge" and "best available objective evidence," that unvaccinated employees, regardless of accommodation, posed a significant risk of substantial harm to the health and safety of patients and others in the workplace. Plaintiff offers no contrary evidence that, despite her vaccination status, she could have safely performed the essential functions of her job. Accordingly, PeaceHealth is also entitled to summary judgment on its direct threat defense to Plaintiff's ADA and Oregon disability discrimination claim.

Page 47 – OPINION AND ORDER

## CONCLUSION

For the reasons explained, the Court GRANTS Defendant's Motion for Summary Judgment, ECF No. 47, and Defendant's Motion to Strike, ECF No. 69. Plaintiffs' claims are DISMISSED.  Judgment shall be entered accordingly.

It is so ORDERED and DATED this __17th__ day of March 2026.


 /s/Ann Aiken
ANN AIKEN
United States District Judge


Page 48 – OPINION AND ORDER